IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

PHILLIP BRIAN JEFFERSON

CRIMINAL CASE NO.

1:09-CR-324-WSD-RGV

**MAGISTRATE JUDGE'S FINAL REPORT,
RECOMMENDATION, AND ORDER**

Defendant Phillip Brian Jefferson ("Jefferson"), is charged in a three-count indictment with possessing a firearm after a felony conviction, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), possessing with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). [Doc. 9].[1] Jefferson has filed a motion to suppress evidence, [Doc. 17], motions to dismiss counts one and three of the indictment, [Docs. 15 & 16], and a motion for a court-ordered polygraph test, [Doc. 52]. Following an evidentiary hearing on the motion to suppress,[2] the parties filed post-hearing briefs, [Docs. 68, 69, & 70], and the

---

[1] The indictment also includes a forfeiture provision.  [Doc. 9 at 2-3].

[2] See Docs. 57 and 61 for the transcripts of the evidentiary hearings, held on November 19, 2009, and January 28, 2010.  Citations to the evidentiary hearing transcripts hereinafter will be referred to as "( Nov. Tr. at ___)" and "(Jan. Tr. at

motions are now ripe for review.  For the following reasons, Jefferson's motion for
a court-ordered polygraph test, [Doc. 52], is **DENIED**, and it is **RECOMMENDED**
that his motion to suppress, [Doc. 17], and motions to dismiss, [Docs. 15 & 16], be
**DENIED**.

## I.  STATEMENT OF FACTS

**A.**   *Initial Stop*

On March 27, 2009, at approximately 5:43 p.m., Officer Richard Barthelemy,
who was on routine patrol in his marked patrol car near the intersection of Ralph
David Abernathy ("RDA") Boulevard and Joseph E. Lowery Boulevard in Atlanta,
Georgia, was checking vehicle license plates through a computer database when he
noticed a blue Crown Victoria vehicle traveling east on RDA Boulevard at a high
rate of speed.  (Nov. Tr. at 6-9, 32-33, 38-39, 42, 115).  Officer Barthelemy turned left
onto RDA Boulevard from Joseph E. Lowery Boulevard, followed the blue Crown
Victoria, and ran the vehicle's license plate information on his police computer.
(Nov. Tr. at 6-8).  The computer indicated the license plate was expired, and Officer
Barthelemy initiated a traffic stop near the intersection of RDA Boulevard and
Culberson Street.  (Nov. Tr. at 6, 8-9, 40-41, 110; Jan. Tr. at 5).

_____

___)."  In addition, the parties submitted exhibits at the hearing, which will be
referred to as "(Gov. Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for
Jefferson's exhibits.

The driver of the blue Crown Victoria, later identified as defendant Jefferson, turned right onto Culberson Street, and stopped the vehicle. (Nov. Tr. at 8, 10-11, 28, 42; Def. Ex. 4). Prior to exiting his patrol car, Officer Barthelemy, who could not see Jefferson due to the vehicle's tinted windows, noticed that the driver's side door of the vehicle was slightly ajar and that Jefferson's foot was outside of the vehicle. (Nov. Tr. at 11, 43-44, 47, 63, 69, 106, 111; Jan. Tr. at 5). While still seated in his patrol car, Officer Barthelemy, through his open window, directed Jefferson to "get back inside the vehicle," and Jefferson complied.[3] (Nov. Tr. at 11, 45-46, 69, 106-07, 111; Jan. Tr. at 5).[4] Before Officer Barthelemy approached his vehicle, Jefferson called his fiancée to ask whether she knew if he "had some warrants or anything" that would explain why he had been stopped. (Nov. Tr. at 117-18, 124-25).

After approximately five minutes had passed, Officer Barthelemy approached Jefferson's vehicle, and Jefferson concluded his phone conversation with his fiancée. (Nov. Tr. at 116, 118, 120, 123-24; Def. Ex. 4). As Officer Barthelemy approached Jefferson's vehicle, he noticed that the driver's side door was again open and he again instructed Jefferson to remain inside the vehicle. (Nov. Tr. at 11, 48-49, 64, 69,

_____

[3] Jefferson testified that Officer Barthelemy first communicated with him about five minutes after the stop when he approached Jefferson's vehicle and asked for his license and registration. (Nov. Tr. at 115-16).

[4] Officer Barthelemy testified that he believed Jefferson was "trying to flee" the scene at this point. (Nov. Tr. at 94).

73-75, 107, 111).   Once Officer Barthelemy reached the driver's side door, he asked Jefferson, who was seated in the driver's seat and had closed the door, for his license and registration.   (Nov. Tr. at 11, 116).   Officer Barthelemy and Jefferson offered conflicting testimony at the evidentiary hearing as to what next transpired.

**B.**     *Officer Barthelemy's Testimony*

According to Officer Barthelemy, when he requested Jefferson's license and registration, Jefferson stated, "Why the f*** are you stopping me?" (Nov. Tr. at 11, 52, 69-70, 85-86, 93).   Officer Barthelemy, who was standing directly in front of the driver's side door, then told Jefferson to exit the vehicle.   (Nov. Tr. at 11, 52).   Officer Barthelemy initially testified that Jefferson immediately opened the door with such force that it knocked Officer Barthelemy down.   (Nov. Tr. at 12, 52).   However, Officer Barthelemy later testified that when he noticed how aggressively Jefferson was pushing the door open to exit the vehicle, he tried to push the driver's door shut in order to keep Jefferson inside the vehicle because he believed that Jefferson was "trying to escape" and that it was "safer for [Jefferson] to stay inside than come outside." (Nov. Tr. at 12, 52-53, 64, 75-77, 94, 96, 98-100).   Officer Barthelemy and Jefferson struggled over the car door as Officer Barthelemy pushed against the door

and Jefferson pushed to open it.   Jefferson eventually pushed the door open, knocking Officer Barthelemy down.  (Nov. Tr. at 12, 15, 52-55, 70, 76-77).[5]

Officer Barthelemy regained his footing and tried to grab Jefferson's wrist and arm, but was unsuccessful.  (Nov. Tr. at 12, 54-57).  Officer Barthelemy again tried to grab Jefferson and made contact with Jefferson's torso, but he was still unable to detain him as Jefferson was "too big" and "shrugged" him off.  (Nov. Tr. at 12, 57-58).  Jefferson walked toward the back of his vehicle and reached the sidewalk between his vehicle and the patrol car.  (Nov. Tr. at 13, 15, 58-59, 61, 76, 100).  At this time, Officer Barthelemy sprayed Jefferson's face with his APD-issued pepper-spray, and Jefferson tried to wipe his eyes and fled on foot.  (Nov. Tr. at 13-14, 59, 61-62, 66, 72, 76, 101).

Immediately thereafter, Officer Barthelemy radioed APD dispatch for backup and began chasing Jefferson on foot.  (Nov. Tr. at 14, 62).  Officer Barthelemy chased Jefferson for approximately one minute, but then lost sight of him as he ran into the

---

[5] Officer Barthelemy also testified that based on his observation that Jefferson was "trying to flee" by opening his car door while the officer was still in his patrol car, coupled with the comment Jefferson made when the officer approached his vehicle, he "knew there was going to be a struggle" and "the best way to start a struggle was you starting it yourself," so he prepared himself for the ensuing struggle, and when Jefferson came out of the car too aggressively, Officer Barthelemy "tried to pull [Jefferson] out of the vehicle," by either grabbing Jefferson through the open door or open window, and he immediately said "this is not the way to go."  (Nov. Tr. at 94-95, 98-100).

woods near Culberson Street.  (Nov. Tr. at 14-15, 62).  Officer Barthelemy and other

APD officers who arrived on the scene, including Lieutenant Rick Mason, continued

a perimeter search for Jefferson but were unable to locate him.  (Nov. Tr. at 16; Jan.

Tr. at 4-5).  Officer Barthelemy then returned to Jefferson's vehicle and decided to

impound the vehicle pursuant to the APD's standard vehicle impound policy, which

authorizes officers to impound and inventory vehicles that are "parked on a city

street without a tag or with an expired tag."  (Nov. Tr. at 16-17, 19, 28, 78, 80; Gov.

Ex. 3).  Officer Barthelemy then began to inventory the vehicle pursuant to APD

policy.  (Nov. Tr. at 16-17, 89; Gov. Ex. 3).

Officer Barthelemy, with the assistance of a fellow officer, prepared an APD

Vehicle Record and Impound Report, which detailed the vehicle's owner, driver,

identification number, make, model, color, year, and tag, and the reason for the

impound.  (Nov. Tr. at 18, 20, 23; Gov. Ex. 4).  Officer Barthelemy also prepared

property sheets that listed the items recovered from the vehicle, the name and date

of birth of the suspect that fled the scene, and the primary charge for the suspect.

(Nov. Tr. at 21-24; Gov. Exs. 5-8).  The officers searched the entire passenger

compartment of Jefferson's vehicle and recovered, among other things, an IRS Form

1040 tax return bearing the name "Phillip Jefferson" as well as bank statements

bearing the name "Phillip Jefferson" from a gray bag under the driver's seat.

Officers also found a powdered substance suspected to be cocaine and an unspecified solution in the gray bag.  Officers recovered a Taurus .45 caliber firearm loaded with nine rounds of ammunition from between the driver's seat and the front passenger seat, a magazine clip for a rifle from the trunk of the vehicle, and a scale and plastic baggies.  (Nov. Tr. at 24-27; Gov. Exs. 5-8).  Based on the documents recovered from the vehicle which bore the name "Phillip Jefferson," Lt. Mason and Officer Barthelemy "pulled up a photograph of the individual the car was registered to," and Officer Barthelemy identified the driver of the vehicle that fled the scene as Jefferson.  (Jan. Tr. at 6).

**C.**   *Jefferson's Testimony*

According to Jefferson, when Officer Barthelemy approached the driver's side of his vehicle, Jefferson asked, "What's the problem?" and Officer Barthelemy responded by repeating his question in an aggressive tone.  (Nov. Tr. at 116).  Jefferson then said, "Yeah, what did you pull me over for?" and Officer Barthelemy told him to get out of the vehicle, and tugged on the car door handle at the same time.  (Nov. Tr. at 116-17).  Jefferson explained that his car door was closed and locked but his window was rolled down, so Officer Barthelemy reached into the vehicle through the open window and attempted to open the door from the inside.  (Nov. Tr. at 116-17, 132).  In response, Jefferson asked Officer Barthelemy what he

was doing and "pushed [Officer Barthelemy's] arm back out of [the] window." (Nov. Tr. at 117, 133).

Jefferson testified that he again called his fiancée and told her to contact a lawyer and the police because he believed he was being harassed. (Nov. Tr. at 120, 126, 142). Jefferson also recalls Officer Barthelemy talking on his radio, "calling for assistance," and then trying to open the door again. (Nov. Tr. at 117, 121). Jefferson testified that "when he reached back in my door, I told him, look, I don't want any problems. I'll get out." (Nov. Tr. at 121, 133). As Jefferson attempted to exit the vehicle, Officer Barthelemy then decided to keep him inside the vehicle by leaning "up against the door," sandwiching Jefferson between the door and the vehicle. (Nov. Tr. at 121-22, 133). Jefferson eventually pushed the door off of him and "slid out of the car door." (Nov. Tr. at 122). After Jefferson exited the vehicle, Officer Barthelemy grabbed his left wrist, but then let go and sprayed him with pepper spray. (Id.). Jefferson "spit some of it out of [his] mouth and wiped [his] face," and then fled the scene on foot. (Nov. Tr. at 122, 134).

## II.  DISCUSSION

**A.**     **Jefferson's Motion for a Court-Ordered Polygraph Test, [Doc. 52]**

Jefferson moves the Court to direct the government to administer a polygraph examination to him in an effort to corroborate his testimony at the suppression

hearing.  [Doc. 52].  The government opposes this motion and contends that Jefferson has failed to satisfy the guidelines for using polygraph evidence to corroborate testimony as set forth in United States v. Piccinonna, 885 F.2d 1529, 1536 (11th Cir. 1989) (*en banc*).  [Doc. 53].

Piccinonna "restricts the use of polygraph evidence in this Circuit to only two contexts.  A district court may admit polygraph evidence when the parties stipulate in advance as to the test's circumstances and scope of its admissibility, or 'to impeach or corroborate the testimony of a witness at trial.'"  United States v. Henderson, 409 F.3d 1293, 1301-02 (11th Cir. 2005) (quoting United States v. Gilliard, 133 F.3d 809, 811-12 (11th Cir. 1998) (citing Piccinonna, 885 F.2d at 1536)).[6]  In order to admit polygraph evidence for the purpose of impeaching or corroborating a witness' testimony, a party must satisfy three conditions:

> First, it must provide adequate notice to the opposing party that it will offer polygraph evidence.  Second, the opposing party must be given a reasonable opportunity to have its own polygraph expert administer a test covering substantially the same questions.  Third, the Federal Rules of Evidence for the admissibility of corroboration or impeachment testimony will govern the proffer.

---

[6] The parties have not stipulated to the "test's circumstances and scope of its admissibility," Henderson, 409 F.3d at 1302, and Jefferson admits that "[i]t is the second category (specifically, to corroborate [his] testimony at the suppression hearing) that concerns us here," [Doc. 52 at 1].

Id. at 1302 (citing Piccinonna, 885 F.2d at 1536) (internal citations and marks omitted).

Jefferson states that he "seeks to shortcut the first two requirements by having the Court order the government to administer the polygraph test, thereby allowing the 'opposing party' to choose the 'expert' and control the administration of the test, including the formulation of the relevant test questions."   [Doc. 52 at 2 ¶ 2].  In response, the government points out that granting Jefferson's request would lead to "two otherwise unavailable results that inure to his benefit– (1) a *de facto* stipulation between the parties and (2) shifting the financial expense of a polygraph examination from [Jefferson] to the [g]overnment."   [Doc. 53 at 4-5].[7]  The Court agrees with the government and finds that Jefferson, as the proponent of the motion, must satisfy the conditions set forth in Piccinonna, which he has failed to do.[8]  See

_____

[7] Jefferson concedes that he "has not found any cases wherein a court ordered the government to administer a polygraph test to the defendant," [Doc. 52 at 2 ¶ 3], but he relies on United States v. Hardman, No. 2:05 CR 20044-0, 2007 WL 4144929, at *4 (W.D. La. Nov. 20, 2007) and United States v. Goetz, No. 09-CR-132 (D. Minn. 2009), in which the district courts ordered polygraph examinations.  These cases, however, are distinguishable, and furthermore, the Eleventh Circuit has set forth guidelines for the admission of polygraph evidence for the purpose of impeaching or corroborating a witness' testimony, which this Court is not free to ignore.  See Piccinonna, 885 F.2d at 1536.

[8] Furthermore, in addressing Jefferson's motion to suppress, and for purposes of this Report and Recommendation, the Court credits Jefferson's version of events that occurred on March 27, 2009.  Therefore, the polygraph examination is unnecessary and would not be useful in ruling on the suppression motion.  See

United States v. Gary, No. 09-14047-CR, 2010 WL 1375411, at *2 (S.D. Fla. Mar. 30, 2010).  Accordingly, Jefferson's motion for a court-ordered polygraph test, [Doc. 52], is **DENIED**.

### B.     Jefferson's Motion to Suppress Evidence, [Doc. 17]

Jefferson contends that the evidence seized from his vehicle on March 27, 2009, was obtained in violation of his Fourth Amendment rights.  [Doc. 69].  The government contends that Jefferson does not have standing to challenge the seizure of evidence because he did not have a legitimate expectation of privacy in the vehicle in which the evidence was located because he abandoned the vehicle before the evidence was seized by law enforcement.   [Doc. 68].   Alternatively, the government argues that the evidence was recovered as a result of a valid vehicle inventory search that was conducted in accordance with APD policy.  [Id.].  In response, Jefferson argues that Officer Barthelemy's actions during the incident "constituted police misconduct," which "directly resulted in [his] involuntarily abandoning his vehicle."  [Doc. 69 at 9].  Therefore, Jefferson argues that "the evidence obtained in the course of the subsequent inventory search must be suppressed as fruits of the poisonous tree."  [Id. at 10].  The Court will address the merits of these arguments.

---

(Nov. Tr. at 154).

1.      **Abandonment**

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.[9]  However, "'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'"  Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)).  Consequently, to prevail on a claim that the government conducted an unconstitutional search under the Fourth Amendment, Jefferson must first establish that he has a legitimate expectation of privacy in the place searched that society is prepared to recognize as reasonable.  Id. at 133-134.  See also California v. Ciraolo, 476 U.S. 207, 211 (1986) (standing to challenge search requires a subjective expectation of privacy that society would recognize as legitimate); United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984) (per curiam).  In other words, Jefferson has the burden to establish that he has standing to challenge

---

[9] The "[t]emporary detention of individuals during the stop of an automobile by the police, even if for only a brief period and for a limited purpose, constitutes a 'seizure' of persons within the meaning of this provision."  Whren v. United States, 517 U.S. 806, 809-10 (1996) (citations omitted); United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001).  A traffic stop is reasonable, however, if the officer had probable cause to believe that a traffic violation has occurred.  United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) (citing Whren, 517 U.S. at 810).  See also United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009); United States v. Monzon-Gomez, 244 Fed. App. 954, 959 (11th Cir. 2007) (per curiam) (unpublished).

the search or seizure.  United States v. Lately, No. 04-CR-80292, 2005 WL 3434857, at *5 (E.D. Mich. Dec. 13, 2005).  "Thus, the determination of whether an individual has a legitimate expectation of privacy in the property requires a careful analysis of the facts of the particular case and the individual's expectation must be justifiable under the circumstances."  United States v. Crisp, 542 F. Supp. 2d 1267, 1274 (M.D. Fla. 2008) (citations omitted).

"One who voluntarily abandons personal property in the Fourth Amendment sense abandons one's reasonable expectation of privacy in that property and cannot challenge the constitutionality of its subsequent search or seizure."  United States v. Anderson, 754 F. Supp. 442, 443 (E.D. Pa. 1990) (citing Abel v. United States, 362 U.S. 217, 241 (1960)) (citations omitted).  See also United States v. Tinoco, 304 F.3d 1088, 1117 (11th Cir. 2002); United States v. Cofield, 272 F.3d 1303, 1306 (11th Cir. 2001) (per curiam); United States v. Edwards, 644 F.2d 1, 2 (5th Cir. Unit B May 1981) (per curiam);[10] United States v. Stevenson, 396 F.3d 538, 546 (4th Cir. 2005); United States v. Collis, 766 F.2d 219, 222 (6th Cir. 1985) (per curiam); United States v. Cruz, No. 5:06-CR-95 (WDO), 2007 WL 781866, at *5 (M.D. Ga. Mar. 13, 2007).  "Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an

---

[10] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

illegal search or seizure of property which has been abandoned." United States v. Quintana-Grijalva, 332 Fed. App. 487, 491-92 (10th Cir. 2009) (unpublished) (internal marks and citation omitted).

"The abandonment of one's privacy interest is primarily a question of intent and is determined objectively." Anderson, 754 F. Supp. at 443-44 (citation omitted). "The intent may be inferred from words spoken, acts done, and the relevant circumstances existing at the time of the alleged abandonment." Id. at 444 (citing United States v. Colbert, 474 F.2d 174, 176 (5th Cir. 1973)). "The existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary." Id. (internal marks and citations omitted). See also United States v. Segars, 31 F.3d 655, 658 (8th Cir. 1994). "Courts, have, of course, found that abandonment may not be voluntary if it is merely the product of police misconduct." United States v. Pirolli, 673 F.2d 1200, 1204 (11th Cir. 1982) (citation omitted). Mindful of these principles, the Court turns to the totality of the circumstances, and the reasonable inferences to be drawn therefrom, regarding the traffic stop of Jefferson on March 27, 2009.

Jefferson does not challenge the initial stop of his vehicle by Officer Barthelemy, and it is undisputed that Officer Barthelemy lawfully stopped Jefferson's vehicle based on the vehicle's expired tag. (Jan. Tr. at 6, 8-9, 40-41, 110);

see also O.C.G.A. § 40-6-15(a) ("Any person who knowingly drives a motor vehicle on any public road or highway of this state at a time when the vehicle registration of such vehicle is suspended, canceled, or revoked shall be guilty of a misdemeanor.").  It is also undisputed that Jefferson, after a struggle with Officer Barthelemy, fled the scene on foot, abandoning his vehicle on Culberson Street.  (Jan. Tr. at 13-14, 59, 61-62, 66, 72, 76, 101, 122, 134).  Therefore, the issue is whether Jefferson's flight from the scene was involuntary due to Officer Barthelemy's actions during the stop and subsequent struggle.  Because Officer Barthelemy gave differing accounts of the encounter during his testimony, (Nov. Tr. at 11-15, 43-62, 73-77, 84-87, 93-101), the Court credits Jefferson's version of events, but finds that his motion is due to be denied.

"Law enforcement officials literally risk their lives each time they approach occupied vehicles during the course of investigative traffic stops."  United States v. Stanfield, 109 F.3d 976, 978 (4th Cir. 1997).  Additionally, "[w]hen, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially. . . ."  Id. at 981.  "In recognition of the extraordinary dangers to which officers are exposed during such encounters, the [Supreme] Court has consistently accorded officers wide latitude to protect their

safety, authorizing them . . . to routinely order both drivers and passengers to exit their vehicles during such stops . . .," id. at 978,  to "open the door of a vehicle with darkly tinted windows to check for weapons, order the occupants to raise their hands during the stop, and use a flashlight to check the dark interior of a car," United States v. Holt, 264 F.3d 1215, 1223 (10th Cir. 2001) (*per curiam*) (internal citations omitted).  Therefore, insofar as Officer Barthelemy was conducting a valid traffic stop, he was authorized to order Jefferson to exit the vehicle.  United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1336 (N.D. Ga. 2009) (citing Maryland v. Wilson, 519 U.S. 408, 414-15 (1997) & Pennsylvania v. Mimms, 434 U.S. 106, 110-11 & n.6 (1977)).  See also United States v. Hollins, 336 Fed. App. 921, 922-23 (11th Cir. 2009) (*per curiam*) (unpublished).

Additionally, "[t]he courts have held that because law enforcement officials have the right to order the driver to exit the car, they also have the concomitant power to use appropriate forcible means to enforce this order." Clark v. Rusk Police Dep't, Civil Action No. 6:07cv340, 2008 WL 4179322, at *2 (E.D. Tex. Sept. 8, 2008). Indeed, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989).

16

Here, when Officer Barthelemy approached Jefferson's vehicle and asked for his license and registration, Jefferson responded by saying, "What's the problem?" (Nov. Tr. at 11, 116). Officer Barthelemy and Jefferson had a further exchange of words, and the officer told Jefferson to get out of the vehicle, and tugged on the car door handle at the same time. (Nov. Tr. at 116-17). When Officer Barthelemy discovered that the car door was locked, he reached into the vehicle through the driver's side window in an attempt to unlock the door, but Jefferson pushed his arm back out of the window. (Nov. Tr. at 116-17, 132-33). Jefferson did not comply with the officer's command to exit the vehicle, and instead remained inside and placed a phone call to his fiancée. It was not until Officer Barthelemy attempted to reach into the vehicle again that Jefferson finally said to him, "I don't want any problems. I'll get out." (Nov. Tr. at 121, 133). At this point, a physical struggle over the car door ensued as Officer Barthelemy had decided to keep Jefferson in the vehicle, but Jefferson forced open the door and exited the vehicle. (Nov. Tr. at 121).

Officer Barthelemy was authorized to order Jefferson to exit the vehicle, and when he failed to comply, to take further action in the interest of officer safety to physically remove Jefferson from the vehicle, which would include opening the vehicle door, reaching in through the window in an attempt to unlock the door, and physically removing Jefferson from the vehicle. See United States v. Bradley, No.

17

CR409-167, 2009 WL 4281260, at *3 n.5 (S.D. Ga. Nov. 5, 2009), adopted at 2009 WL 4348951, at *1 (N.D. Ga. Nov. 30, 2009) ("When defendant failed to comply with [officer's] lawful order to exit the vehicle, the officer was entitled to employ reasonable force to remove defendant from the vehicle."); United States v. Rookard, No. 05-CR-332S, 2007 WL 2176895, at *6 (W.D.N.Y. July 27, 2007), adopted at *1 (finding officer's actions in opening the vehicle door and physically removing defendant when he refused to comply with repeated commands to show his hands not violative of the Fourth Amendment).  See also United States v. Douglass, 467 F.3d 621, 622-23 (7th Cir. 2006) (affirming defendant's conviction where officer, who "realized [defendant] was not getting out of the car," attempted to open defendant's vehicle door to pull defendant out, but when it was locked, reached in through a partially opened window and sprayed defendant in the face with pepper spray in an effort to reach inside and unlock the door); Lawyer v. City of Council Bluffs, 361 F.3d 1099, 1105 (8th Cir. 2004) (finding officer's actions of attempting to open the locked vehicle door and reaching inside the vehicle through window to unlock and open door reasonable when suspect failed to comply with officer's directive for him to exit vehicle).  Therefore, Officer Barthelemy's actions in ordering Jefferson to exit the vehicle and attempting to open Jefferson's locked vehicle door by reaching in

through the window when Jefferson failed to comply with his order to exit were reasonable and not violative of the Fourth Amendment.

When Jefferson finally said he would get out, Officer Barthelemy decided to keep him in the vehicle and a struggle ensued.  (Nov. Tr. at 12, 15, 52-55, 64, 70, 75-77, 94, 96, 98-100, 121-22, 133).  Eventually, Jefferson forced the car door open enough to exit the vehicle, and Officer Barthelemy sprayed him in the face with pepper spray.  (Nov. Tr. at 12-14, 54-59, 61-62, 66, 72, 76, 101, 122).  Jefferson argues that the use of pepper spray was excessive, "goes far beyond what is reasonably necessary to ensure the Officer's safety," and caused him to flee the scene.  [Doc. 69 at 12-13, 15].  The Court, however, disagrees.

"Courts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else."  Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) (citations omitted).  However, where a subject is "either resisting arrest or refusing police requests," courts have consistently ruled that using pepper spray is reasonable.  Id. (citations omitted); Lawyer, 361 F.3d at 1105 (officer's actions were objectively reasonable when he deployed pepper spray inside a stopped vehicle after reaching his arm into window to unlock door and driver began to roll up window onto officer's arm);

19

Smith v. Addy, 343 Fed. App. 806, 808 (3d Cir. 2009) (*per curiam*) (unpublished) (officer reasonably used pepper spray when individual assumed fighting stance after being pulled over for routine traffic stop and physically resisted the officer). In fact, "as a means of imposing force, pepper spray is generally of limited intrusiveness, and it is designed to disable a suspect without causing permanent injury." Vinyard, 311 F.3d at 1348 (internal marks and citations omitted). "Indeed, pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee." Id.

In the present case, Jefferson refused to comply with Officer Barthelemy's initial request to exit the vehicle and physically opposed the officer's attempt to open the door by pushing his arm out of the vehicle. (Nov. Tr. at 117, 133). Jefferson then remained in the vehicle and placed a call to his fiancée. (Nov. Tr. at 120). Once Jefferson said he would get out, Officer Barthelemy decided to keep him in the vehicle, and the physical struggle over opening the car door ensued, with Jefferson eventually prevailing and exiting the vehicle. (Nov. Tr. at 121). Based on the totality of the circumstances of this case, it was reasonable for Officer Barthelemy to believe that Jefferson was not complying with his orders and physically resisting him, and "the use of pepper spray, in the face of [Jefferson's] non-compliance, plainly was proportional to the need for force." Benton v. Hopkins, 190 Fed. App. 856, 860 (11th

Cir. 2006) (*per curiam*) (unpublished).  Indeed, "it was [Jefferson's] own actions that had turned the encounter . . . from a routine traffic stop into a physical altercation culminating in the use of pepper spray."  Hall v. Raech, 677 F. Supp. 2d 784, 803 (E.D. Pa. 2010) (internal marks and citation omitted).  Thus, Jefferson's argument in this regard is without merit.

In sum, while Jefferson contends that Officer Barthelemy initiated the struggle that precipitated his flight from the scene,[11] Jefferson's own account of the events shows that he did not comply with the officer's order to get out of the car, and he initiated the physical altercation by pushing Officer Barthelemy's arm out of his vehicle when the officer attempted to unlock the car door.  (Nov. Tr. at 117).  Jefferson's physical resistance continued when he struggled with Officer Barthelemy over opening the car door, and Jefferson eventually overpowered the officer and got out of the car.  Under the circumstances of this escalating physical struggle with Jefferson, Officer Barthelemy's actions, including using pepper spray, were

_____

[11] Jefferson emphasizes Officer Barthelemy's testimony that he "knew there was going to be a struggle," and that "the best way to start a struggle was you starting it yourself."  (Nov. Tr. at 94).  However, both Jefferson and Officer Barthelemy testified that it was Jefferson who started the physical struggle, albeit by different means, as Officer Barthelemy testified that Jefferson opened the door into him aggressively, and Jefferson testified that he pushed the officer's arm out of his car when he reached in to unlock the door.

reasonable and did not render Jefferson's abandonment of the vehicle involuntary.[12]

Thus, by fleeing the scene, Jefferson voluntarily relinquished any reasonable

expectation of privacy in the vehicle and its contents and his standing to oppose the

subsequent seizure of items from the vehicle.  United States v. Edwards, 441 F.2d

749, 751-52 (5th Cir. 1971) (finding defendant had no expectation of privacy in car

he abandoned by fleeing from police on foot); United States v. Hunter, Criminal File

No. 1:07-CR-310-1-TWT, 2008 WL 552881, at *7 n.6 (N.D. Ga. Feb. 25, 2008), adopted

at *1 (noting that items seized from vehicle would be admissible because defendant

abandoned his interest in vehicle when he fled from it following a police chase). See

also United States v. Kirlew, 291 Fed. App. 536, 538 (4th Cir. 2008) (per curiam)

(unpublished) (finding defendant abandoned vehicle when he jumped out of it and

fled on foot, stating that "abandonment may be found where a fleeing defendant

relinquishes an object to make his flight easier") (internal marks and citation

omitted); United States v. Lewis, No. CR 08-1136-FRZ-JCG, 2009 WL 1856643, at *6

(D. Ariz. June 29, 2009), adopted at *1 (finding defendant who fled from vehicle

manifested intention to abandon it); United States v. Noble, No. 07 Cr. 284(RJS), 2008

WL 1990707, at *6 (S.D.N.Y. May 7, 2008) (finding defendant abandoned vehicle

---

[12] Evaluating the encounter under Officer Barthelemy's version of events leads
to the same conclusion since he also indicated that Jefferson initiated the physical
struggle by aggressively opening the driver's door and actively resisted the officer's
efforts to subdue him before the use of the pepper spray.

when he crashed it on the side of the road and fled on foot); <u>United States v.</u> <u>Muhammad</u>, 554 F. Supp. 2d 1314, 1320 (M.D. Fla. 2008), adopted at 1316 (finding that because defendant "abandoned the firearm before he was seized," he "does not have standing to contest the seizure of the abandoned property"); <u>United States v.</u> <u>Lawrence</u>, Criminal No. 06-83, 2007 WL 925893, at *3 (E.D. Pa. Mar. 16, 2007) (finding defendant abandoned vehicle when he ran away from it); <u>United States v.</u> <u>Welch</u>, No. CRIM.05-50111, 2006 WL 2666307, at *2 (W.D. La. Sept. 15, 2006), adopted at *1 ("Defendant has no standing to complain about the search of property that he has voluntarily abandoned."); <u>United States v. Libbett</u>, No. 05-CR-6069L, 2006 WL 2620049, at *10 (W.D.N.Y. Sept. 13, 2006), adopted at *2 ("[The defendant] fled on foot, leaving the driver's door open and the engine running. [The defendant's] flight constituted an abandonment of the automobile, and concomitant abandonment of any expectation of privacy he may have had in the vehicle."); <u>United States v. Lynch</u>, 290 F. Supp. 2d 490, 494-97 (M.D. Pa. 2003) (stating that "abandonment would be sufficient reason" for the court to deny defendant's suppression motion where he fled from his vehicle, "leaving the driver's door open and the motor running," after ramming a police cruiser). Accordingly, Jefferson's motion to suppress evidence, [Doc. 17], is due to be denied.

2.    **Inventory**

Although Jefferson lacks standing to challenge the search of the vehicle, the Court will still address the alternative argument presented by the government pertaining to the inventory exception. The government argues that even if Jefferson has standing to challenge the warrantless search of his vehicle, the search was lawful pursuant to an inventory search conducted in accordance with APD policy. [Doc. 68 at 20-23]. Jefferson argues, however, that Officer Barthelemy's "misconduct proximately caused [his] involuntary abandonment of his vehicle, which in turn provided the basis for the inventory search." [Doc. 69 at 18-19]. Therefore, Jefferson argues that the evidence discovered as a result is due to be suppressed as fruit of the poisonous tree. [Id. at 19]. However, having already found that Jefferson voluntarily abandoned his vehicle on March 27, 2009, his fruit of the poisonous tree argument is without merit.

In South Dakota v. Opperman, 428 U.S. 364, 376 (1976), the Supreme Court held that police impoundment and search of vehicles pursuant to the department's standard operating procedure ("SOP") do not violate the Fourth Amendment. The Eleventh Circuit, in Sammons v. Taylor, 967 F.2d 1533 (11th Cir. 1992), defined the framework of the inventory-search exception to the warrant requirement as follows:

> Even if an arrestee's vehicle is not impeding traffic or otherwise
> presenting a hazard, a law enforcement officer may impound the

vehicle, so long as the decision to impound is made on the basis of standard criteria and on the basis of something other than suspicion of evidence of criminal activity.  If the vehicle has been lawfully impounded, the law enforcement officer may conduct an inventory search, including a search of closed containers, provided the search is conducted pursuant to standardized criteria.  Because an inventory search is an exception to the Fourth Amendment's warrant requirement, however, the government officer has the burden to show that the requirements of the inventory search exception have been met.

Id. at 1543 (citing Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971)) (internal marks omitted).  Therefore, "[i]nventory searches are appropriate where police have the authority to impound a vehicle and the search is consistent with established policy."  United States v. Davis, No. 2:07-cr-0248-WKW, 2008 WL 1927377, at *3 (M.D. Ala. Apr. 28, 2008), adopted at *2 (citing United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991)).   See also United States v. Lariscy, No. CR607-10, 2008 WL 621216, at *4 (S.D. Ga. Mar. 4, 2008) (citing Colorado v. Bertine, 479 U.S. 367, 372 (1987) & Williams, 936 F.2d at 1248) ("It is well settled that police officers may conduct inventory searches of vehicles lawfully in their custody provided the inventory is conducted pursuant to standardized government procedures."). "Generally, 'reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment.'" United States v. Richardson, 121 F.3d 1051, 1055 (7th Cir. 1997) (quoting Bertine, 479 U.S. at 374).

25

"Three interests justify this exception, namely (1) protection of the owner's property found in the vehicle, (2) protection of the police from false claims of lost possessions, and (3) protection of the police from potential danger." United States v. Wright, Criminal Action No. 2:07cr91-MHT, 2007 WL 4287803, at *3 (M.D. Ala. Nov. 30, 2007), adopted at *1.   See also United States v. Beckford, No. 1:09-CR-263-TWT-GGB, 2010 WL 1487817, at *4 (N.D. Ga. Feb. 2, 2010), adopted in part at 2010 WL 1489970, at *1 (N.D. Ga. Apr. 13, 2010).  An inventory search is also lawful even though it may be an investigatory search, "so long as [the inventory] was *one* of the police motives."  United States v. Orozco, 715 F.2d 158, 161 (5th Cir. 1983) (*per curiam*) (emphasis in original).

The APD has a SOP which governs when a vehicle is to be impounded and how an inventory is to be conducted.  (Gov. Ex. 3).  The government contends that the officers were authorized to impound Jefferson's vehicle under S.O.P. 4.13.2 subsection (4).  [Doc. 68 at 21].  S.O.P. 4.13.2(4) provides:

> If a vehicle is illegally parked and meets one or more of the conditions listed below, the officer may impound it.  The officer will make reasonable efforts to locate the driver and have him or her move the vehicle.  If the driver is found or comes to the scene before the wrecker leaves with the vehicle, issue the driver a traffic citation for illegal parking and release the vehicle.
>
> . . .

26

4.    The vehicle has been left over eight hours on the shoulder of a freeway or is parked on a city street without a tag or with an expired tag.

(Gov. Ex. 3).

Jefferson has not contested the inventory search of the vehicle, other than to assert his fruit of the poisonous tree argument, and the Court finds that the impoundment and subsequent inventory were proper, since after the officers conducted a search for Jefferson after his flight from the scene, they returned to the vehicle, which was parked on a city street with an expired tag. Thus, the officers lawfully impounded Jefferson's vehicle pursuant to S.O.P. 4.13.2(4). Additionally, the subsequent inventory search was properly documented in accordance with APD policy and, therefore, the evidence was lawfully seized. See Orozco, 715 F.2d at 161; (Gov. Exs. 5-8).

## C.    Jefferson's Motions to Dismiss Counts One and Three, [Docs. 15 & 16]

Jefferson moves to dismiss Counts One and Three of the indictment, [Docs. 15 & 16], which charge him, respectively, with possessing a firearm after a felony conviction, and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 922(g)(1), 924(c)(1)(A), and 924(e), [Doc. 9]. Jefferson argues that Count One must be dismissed because § 922(g) is unconstitutional as the statute exceeds the authority granted to Congress under the Commerce Clause of the

27

United States Constitution and because it violates the Second Amendment. [Doc. 15]. Jefferson also argues that Count Three must be dismissed because § 924(c) violates the Commerce Clause of the United States Constitution. [Doc. 16]. The Court will address the merits of each of these arguments.

> 1. *Count One*

The United States Constitution empowers Congress to "regulate commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has ruled that the Commerce Clause grants Congress the power to regulate commerce in three distinct areas. First, Congress may regulate the use of the channels of interstate commerce. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 247-48 (1964). Second, Congress may regulate the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Shreveport Rate Cases, 234 U.S. 342, 351 (1914). Third, Congress may regulate those activities having a substantial effect on interstate commerce. Maryland v. Wirtz, 392 U.S. 183, 196 (1968), overruled on other grounds by Nat'l League of Cities v. Usery, 426 U.S. 833 (1976).

Jefferson contends that § 922(g), which makes it unlawful for a convicted felon to "possess in or affecting commerce, any firearm or ammunition," exceeds Congressional authority both on its face and as applied to him because "it does not

require a 'substantial' effect on interstate commerce." [Doc. 15 at 2]. However, as Jefferson acknowledges, the Eleventh Circuit has previously addressed such challenges to § 922(g) and rejected them. See United States v. Phaknikone, No. 09-10084, 2010 WL 1838935, at *10 (11th Cir. May 10, 2010); United States v. Martin, 243 Fed. App. 568, 569 (11th Cir. 2007) (per curiam) (unpublished) (rejecting defendant's facial and as-applied challenges to § 922(g)); United States v. Lamb, 162 Fed. App. 889, 892-93 (11th Cir. 2006) (per curiam) (unpublished) (same); United States v. Scott, 263 F.3d 1270, 1274 (11th Cir. 2001) (per curiam) (same); United States v. Dupree, 258 F.3d 1258, 1260 (11th Cir. 2001) (finding § 922(g) a constitutional exercise of the Commerce Clause). See also United States v. Knight, 562 F.3d 1314, 1328 (11th Cir. 2009) ("To be convicted of possession of a firearm by a convicted felon, the firearm must have affected interstate commerce, and a minimal nexus to interstate commerce is sufficient.") (internal marks omitted); United States v. Carlisle, 173 Fed. App. 796, 799 (11th Cir. 2006) (per curiam) (unpublished) (declining to require more than a showing that a firearm traveled in interstate commerce to establish nexus). Thus, Jefferson's argument is foreclosed by Eleventh Circuit precedent.

Furthermore, while Jefferson argues that that § 922(g) exceeds Congressional authority as applied to him because "the government may prove at most only the

*intrastate* possession of a firearm," [Doc. 15 at 2-3], the government has presented evidence that the firearm at issue in the indictment traveled in or affected interstate or foreign commerce.  Specifically, the government has produced a report from Bureau of Alcohol, Tobacco, and Firearms Special Agent Eric J. Degree, in which Agent Degree opines that the firearm at issue was manufactured in Brazil. [Doc. 39 at 5; Doc. 39-3].  Therefore, the government has shown that the firearm at issue, which was found in Jefferson's vehicle in Georgia traveled in or affected foreign and interstate commerce.  Thus, Jefferson's "as applied" argument is likewise without merit.  See United States v. Lee-Clark, 258 Fed. App. 208, 211-12 (10th Cir. 2007) (unpublished); United States v. Juarez, 454 F.3d 717, 719 (7th Cir. 2006) (rejecting constitutional challenge to § 922(g) and noting that in light of a stipulation that the gun was manufactured in Ohio, "[i]t is undisputed that the gun must have traveled in interstate commerce at some point after its manufacture in order for [the defendant] to possess it in Illinois."); United States v. Lemons, 302 F.3d 769, 772 (7th Cir. 2002) (rejecting Commerce Clause challenge when the gun crossed into Wisconsin "at some indeterminate moment in time" before it was discovered in the defendant's possession); United States v. Singletary, 268 F.3d 196, 205 (3d Cir. 2001) (finding § 922(g) constitutional where there is evidence that "the gun had traveled in interstate commerce, at some time in the past").

Jefferson also argues that § 922(g)(1) violates the Second Amendment and the Supreme Court's ruling in District of Columbia v. Heller, ---U.S. ----, 128 S. Ct. 2783 (2008), because it "does more than limit the type of firearm that [he] may keep in his home or the manner in which he may keep it," but also "prohibits him from owning or possessing any firearm for any purpose whatsoever," [Doc. 15 at 4]. "The Second Amendment to the U.S. Constitution provides: A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." United States v. Jones, 673 F. Supp. 2d 1347, 1350 (N.D. Ga. 2009) (internal marks and citation omitted).

"In Heller, the Supreme Court recognized that the Second Amendment 'guarantee[s] the individual right to possess and carry weapons in case of confrontation' but went on to explain that it 'do[es] not read the Second Amendment to protect the right of citizens to carry arms for any sort of confrontation, just as [it] do[es] not read the First Amendment to protect the right of citizens to speak for any purpose.'" Jones, 673 F. Supp. 2d at 1350 (quoting Heller, 128 S. Ct. at 2797, 2799) (emphasis omitted). Specifically, with regard to the scope of its holding, the Supreme Court stated:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner

31

> whatsoever and for whatever purpose . . . . Although we do not
> undertake an exhaustive historical analysis today of the full scope of
> the Second Amendment, nothing in our opinion should be taken to cast
> doubt on longstanding prohibitions on the possession of firearms by
> felons and the mentally ill, or laws forbidding the carrying of firearms
> in sensitive places such as schools and government buildings, or laws
> imposing conditions and qualifications on the commercial sale of arms.

Heller, 128 S. Ct. at 2816-17. "Thus, the Court cited bans on possession of firearms

by felons as an example of a question that might arise, given its ruling, and provided

the answer: nothing in its opinion should be taken to cast doubt on such laws."

Jones, 673 F. Supp. at 1350. Therefore, "[b]ecause the Supreme Court in Heller stated

that 'the right secured by the Second Amendment is not unlimited' and 'nothing in

our opinion should be taken to cast doubt on longstanding prohibitions on the

possession of firearms by felons . . .,' [Jefferson's] argument that the permanent

prohibition of the right to bear arms, as found in [§ 922(g)(1)], violates the Second

Amendment is without merit." United States v. Battle, 347 Fed. App. 478, 480 (11th

Cir. 2009) (per curiam) (unpublished). Accordingly, the undersigned

**RECOMMENDS** that Jefferson's motion to dismiss Count One, [Doc. 15], be

**DENIED**.

2.    *Count Three*

Jefferson contends that Count Three should be dismissed because the jurisdictional scope of § 924(c) violates the Commerce Clause of the United States Constitution.  [Doc. 16].  Section 924(c) provides in pertinent part:

> [A]ny person, who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime . . . [be subjected to additional imprisonment].

18 U.S.C. § 924(c)(1)(A).  Jefferson contends that this "phrase contains two possible 'jurisdictional hooks,' both of which exceed the limits of the Commerce Clause." [Doc. 16 at 2].  Specifically, Jefferson argues that the "definition of 'crime of violence' does not properly narrow the scope to *federal* crimes."  [Id.].  Additionally, Jefferson argues that the fact that the crime of violence must be one which "may be prosecuted in a court of the United States," does not limit its application to federal courts.  [Id. at 3].

In response, the government contends that Jefferson does not have standing to raise a constitutional challenge to the crime of violence provision and the related jurisdictional element of § 924(c)(1)(A) because he is not being prosecuted under that provision.  [Doc. 42].  Additionally, the government argues that the overbreadth doctrine does not apply to the crime of violence provision, that § 924(c) is not

33

unconstitutionally vague as applied to Jefferson, and that Jefferson has not shown that the crime of violence provision is unconstitutional in all of its possible applications.  [Id. at 1-2].

"[W]hen a litigant's conduct clearly falls within the permissible purview of a statute, such an individual lacks standing to challenge the statute for vagueness, even though the statute may well be vague even as applied to others." United States v. Fumo, 628 F. Supp. 2d 573, 597-98 (E.D. Pa. 2007) (internal marks and citation omitted).  "[A]lthough defendants in a criminal case have a right to raise the constitutional claims of third parties as well as their own, they still must show injury in fact." United States v. Buddenberg, No. CR-09-00263 RMW, 2009 WL 3485937, at *3 (N.D. Cal. Oct. 28, 2009).  "A defendant in a criminal proceeding is entitled to insist that his conduct be judged in accordance with a rule that is constitutionally valid." Id. (internal marks and citation omitted).  "However, a facial challenge cannot be based upon provisions of a statute which caused them no injury and with which they have neither been charged nor threatened to be charged." Id. (citations omitted).

Here, Jefferson is charged with possessing a firearm in furtherance of a drug trafficking crime.  [Doc. 9].  Jefferson concedes that the phrase "drug trafficking crime" is defined as a violation of specific federal drug laws, which properly limits § 924(c)'s

34

application, [id. at 2 n. 1], but he argues that the statute is unconstitutional on its face based on the crime of violence provision in § 924(c), [Doc. 16]. However, Jefferson lacks standing to challenge this provision since it has caused him no injury, as he has neither been charged nor threatened to be charged under that provision. Buddenberg, 2009 WL 3485937, at *3. In short, as applied to Jefferson, § 924(c)(1)(A) is facially constitutional and does not violate the Commerce Clause.[13] Accordingly, the undersigned **RECOMMENDS** that Jefferson's motion to dismiss, [Doc. 16], be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons and cited authority, the undersigned Magistrate Judge **DENIES** Jefferson's motion for a court-ordered polygraph test, [Doc. 52], and **RECOMMENDS** that his motion to suppress, [Doc. 17], and motions to dismiss, [Docs. 15 & 16], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 25th day of May, 2010.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

[13] Because the Court finds that Jefferson does not have standing to raise a challenge to the crime of violence provision of § 924(c)(1)(A), it need not address the government's remaining arguments.